Good morning, Council. Good morning. Kevin Fitzgerald on behalf of Lee Baker, your honors, good morning. This appeal really focuses on three separate issues and they are really, with the exception of who was paid restitution or who was ordered to be paid restitution, it really is determinative on factual issues. Our submission is that the court in awarding Denali $789,000 in restitution made a clear error by a math mistake. Additionally, our submission is that the court failed to consider additional expenses that were paid for for the exhibition. An additional nearly more than $1 million if L and L1 exhibits are credited, which was the same type of information that was relied upon by Denali in calculating the restitution, but an additional almost $700,000 if you consider the exhibits N, L2, and L3, which demonstrate expenses paid on Bryn Mawr after 12-31-2005. Unless the court had any questions with regard to the who was paid, which was really the issue concerning not only the payment to Denali of $789,000, but also the cumulus, who was the insurer, and our position on that is it creates, unfortunately, a thorny issue because who was paid based on the violation of its own employee, Lee Van Horn, who the evidence indicates, and indeed that was the claim that was asserted by Denali, that Mr. Van Horn and perhaps others that were bank employees had violated the faithful performance coverage as a result of that. You say in past others. I may have missed some point. I thought it was just Van Horn that was the person who was derelict. Judge, is there something in the case that matters on that issue? Not that matters other than in the briefing it's cited that on the 12 false draws made by Mr. Baker that the internal policies and procedures of Denali was to go out actually to the site to make some confirmation with regard to whether the work was actually being performed that was being represented. Yeah, Van Horn should have done that. Well, the evidence actually demonstrates that Mr. Van Horn and his assistant, Deborah Whitback, both went out to the site on the 12 occasions and essentially certified that the work that was to satisfy the draw had been completed. And Ms. Whitback, there's notes in the documents that reflect that Ms. Whitback actually on 10 of the 12 occasions was actually the bank employee who went to the site and confirmed the work. Could I ask you some questions about L and L1? Please. L1 is sort of backup, just to paraphrase, for L, correct? It is. L is the job costing summary and L1 is essentially screenshots of those payments that were actually made related to L. Right. So the areas where I see the district court having given your client credit are areas where he could track through, you know, the expense and the screenshot and the check going out and it was actually paid and could also, so he could verify that a payment was made and he could verify that the cost was incurred for this project. But the ones that I think were disallowed were those that, where that really couldn't all be verified. And again, that's my summary. That's my interpretation of the evidence. L in particular, I'd like to know why you think the court was wrong to decide that these were not sufficiently credible. The prosecution showed several of the examples, the line items there shouldn't have been properly credited. Some of them, a loan fee, for example, wasn't actually paid. And on balance, the judge found this exhibit not sufficiently credible. So why is he wrong about that? I'm going to give you two kind of separate answers to that. Okay. First of all, with regard to just focusing on L and L1, L and L1 were actually the same types of information that had been relied upon by Denali. Because they didn't have, it was some of the same type. But when I look at L and L1 and I went over them really carefully, I couldn't verify that all of those expenses were matched up to the Bryn Mawr project and in other instances I couldn't verify that the checks were actually cut. I appreciate there were screenshots from your client's internal computer, but to be specific, Mr. Fitzgerald, I couldn't, those are the two other pieces of information I couldn't verify in that exhibit. So if I'm missing it, I'd really invite you to show me where I should find that. Well, with regard to the first point is that Denali relied on the same type of information. And indeed, if you look at Exhibit E, which is Excerpt 464 through 473, you will see that that is a job costing summary. That is exactly the same type of information that's contained in Exhibit L. L1 actually is an additional document which provides corroborative proof that the payments were actually made and to this particular project. Well, but L1s, those are the screenshots. They are. So when you say that, how does that tell me that those payments were actually made? That's not a canceled check. For other expenses, you'll have a canceled check. My first response to you is that this is the same type of information. I appreciate that the court was concerned with regard to two issues, whether it was actually paid and whether it was tied to the Bryn Mawr project. And Mr. Baker was examined on the stand, and you're exactly right. There were areas that he originally indicated that he believed that the expenses exceeded $2 million by a slight amount. And Ms. Randall asked him questions concerning L and L1, and what ultimately happened is that that amount was revised to $1.95 million. So, counsel, it's a government's burden to prove loss, right? Yes. And what is the standard in this case? Is it preponderance? It's biopreponderance. Biopreponderance? Yes. Okay. I also wanted to ask you about this mysterious L3, which apparently, I mean, it has more substance, yet neither one of you included it in the record. It was included at a late date, Judge, by my colleague. After we ordered it to be given to us? Yes. Well, why wasn't it included before? Because it seems as though it would somewhat support your argument. And I think it did. If I could complete my answer with Judge Kristen, I'll just simply say in response to your inquiry, is there were literally hundreds of bankers' boxes involved in this particular case. And immediately after the sentencing, L3 was not submitted until a very late date. Was it given to Judge Beislein? It was. Okay. It was admitted as an exhibit, as Excerpt 45 demonstrates. A copy was provided to my colleague. And after the sentencing, when I was preparing the appeal, I had returned almost all my boxes to my client. The connects that contained the boxes in this literally contained hundreds of boxes of financial documents from which L3 was derived. And both Ms. Randall and I could not find a copy of L3. To my colleague's credit, she did locate it at a late date, and it was provided to the court, albeit it was after the briefing was completed. So all I can tell you is that in essentially the mix of lots of boxes of financial documents, L3 went missing for a bit. So if I can, though, I'd like to talk about the lack of support. And what happened, and I think it's important, is the questions were raised during the course of the various evidential hearings concerning L and L1 for the reasons that we've just talked about. And as a result of that, Mr. Baker went down to the connects, which contains these hundreds of boxes, and actually pulled from those boxes exhibits N, L2, and L3. And if you look at exhibits N, L2, and L3, they provide the support, in my estimation, that the court suggested that it was missing. As an example, just using exhibit N as an example, exhibit N is actually information by the superintendent hired by, through the municipality to monitor the project, indicating that in the spring and summer of 2006, LH Construction was actually doing work on the site. My understanding, if I can cut to the chase on this, because this is an important exhibit also, and I think the reason you offered it is because your client's contention is that the court erred by not giving credit for expenses incurred after a certain date, December 31, I think 2005. And this shows that somebody was going out and expecting that earthwork excavation was being done after that time. But if that's right, and I know I'm paraphrasing because the clock is ticking, but how would we quantify what credit your client is entitled to? This is just a time entry that somebody went out to look, but it doesn't allow us to quantify the work that was done. Sure. And in order to do that, exhibit N is not only actual but corroborative proof that there was $670,000 paid to LH Construction in the year 2006. For what project? For Bryn Mawr. And the way that that becomes clear, Your Honor, is if you look at exhibit L, and this will be excerpt 477, there is an indication with regard to the summary as an example. This is just an example. April 7, 2006, that there was actual expense incurred for the Bryn Mawr project, which is what exhibit L is all about. Indicating expenses associated with Bryn Mawr for $87,802. And then if you look at excerpt 203, which is actually L1, and you look at that, and what you'll see is that this is the paid in full. And what it demonstrates is that there are a number of projects that are being paid for, Lakeview, Gemstone, and then Bryn Mawr, and it tracks this check, $87,802, which is reflected right on the document. So the purpose with regard to exhibit N is that it was not only actual but corroborative proof of the expenses and the information contained in L and L1, which demonstrated that monies were being paid towards LH construction in 2006. So here's, can I, forgive me for interrupting, but your client got, I'm going to say, about a half a million dollars credit for work paid for excavation, and I'm trying to quantify the delta that you think they're missing. Is it this $87,000 that you're telling me? No, no, it's the entire $670,000. Well, why isn't that double counting? They gave you credit. They did, but only up to December 31, 2005. What tells me that another $600,000 was incurred after January 1, 2006? L, L1, and exhibit N. That's it? Yeah. If I can't find it in L, L1, or N, is there any other place I can look? No, but the question is, the question that was posed is with regard to doesn't that constitute double counting, and it doesn't. Because the expenses with regard to dirt work that were credited as an offset were all prior to December 31, 2005. That's the whole import with regard to exhibit E. What's the significance of that date? The significance of the date is because Denali, in determining what restitution was owed, only used documentation up until December 31, 2005 to track expenses. And that is exhibit E, and that's the citation that I provided to the court with regard to exhibit E. On its face, it demonstrates no additional expenses past December 31, 2005. The import of exhibit N in combination with L2 and L3, I'm sorry, L and L1, demonstrate that $670,000 was paid to LH Construction post January 1, 2006. Can we tell, so maybe this is another way to ask my question, can we tell when the work was done as opposed to when the check was cut? Well, to answer that question, yes and no. Not to sound like a lawyer, but in relationship to exhibit N, which actually demonstrates that by virtue of the superintendent monitoring, work was being performed. I can't give you a line item with regard to. Fair enough. I think I understand your answer. Thank you very much. Thank you, counsel. You're well over your time. All right. Thank you. Thank you. Good morning. My name is Greta Randall, and I represent the United States. If I may, before I start, there is one error I would like to correct in my brief at page 26. It's a typo, but a significant one. And it's the second line from the bottom. And this is discussing Mr. Baker's testimony as to aged payables. And it says there, as of December 31, 2007, more likely than not, it should also say, comma, not paid. He admitted that most of these aged payables, by the time that Baker Construction shut down in 2007, that those were not paid, but those were additional items that had been presented to the court as expenses that should have been credited against him. And I apologize for my voice and providing some severe allergies, but Mr. Fitzgerald is incorrect in arguing that the amounts considered stopped at December 31, 2005. If you look at the Exhibit 10 presented by the government at the evidentiary hearing, it's Excerpts of Records 115. This shows the summary of Ms. Lee, the auditor, her testimony as to the credits they gave to Discovery Construction. Now, technically, based on current case law, this is probably not the way we should have proceeded. But everybody agreed what the amount of the illegal draws were. And because these amounts had been decided and analyzed by Denali, the credit union, in terms of the employee action that they were making the bond claim, these were the amounts that they were claiming. They gave, if you look at the second part of this exhibit, they gave over a million dollars in credits back to Mr. Baker. And I think the judge's confusion with the documents that he got, and as Mr. Baker testified, he put everything into a pool. And out of that, Mr. Baker paid whatever he could, which is why ultimately everything went under. He was struggling to survive, but his bookkeeping was very poor. And the judge had a lot of problems with all the numbers being thrown at him at the last minute, with no indexing, with no clarification. And so any time he could see that something was paid, he gave credit for that. An example is the missing L3. This was presented to the court the day of sentencing. Not during the evidentiary hearing, but on the day of sentencing. Why wasn't he entitled to the credit in L3? Because there are de minimis credits in here, but if you look thoroughly through this, it's once again a listing of items at page 32. It's typical of what's presented, a listing of items only. But if you look at the attachments, predominantly most of this is a Lowe's, I think they call it a job report. That covered all of the projects. There are only approximately six, the ones I have tabbed, that pertain to Bryn Mawr. I think I tabbed six as well, but why wouldn't he be entitled? It's $24,176. Why wouldn't he be entitled to that credit? He would be entitled to that, but I think it's fair that the judge didn't see that. It wasn't pointed out to him. He's dumped on him this amount of documents. It's the government's burden, right, to show loss. And so it seems as though you can't blame all this mess on the defendant. I mean, the government could have collated this and done it properly too. Well, actually, the day of sentencing, this is why this went missing. I gave this to my agent, the IRS agent, who had an accounting background, and she was going through it fairly quickly, but we just didn't ask for time to clarify the numbers. Starting from the objections to the pre-sentence report, and we got these numbers in, we would challenge the numbers and try to clarify and give him credit where credit was due. And Judge Beislein gave him $77,000 prior to even getting the loan that we objected to, but Judge Beislein had a history in construction and thought that was legitimate. He added that on to the end. When he got two exhibits that showed legitimate construction costs, he added that on to the end. And actually, the credit union gave Mr. Baker substantial credits on many of the areas that Mr. Baker was asking for, but much of that was included in the numbers he was already getting that were substantiated. And I think in terms of preponderance, mainly in terms of admissibility and the relevance, Judge Beislein did the best he could with what was presented by the government. We gave them legitimate costs. Now, technically, under the recent Supreme Court case, he would only be entitled to the loss minus what the property sold for. The property sold for $650,000. So that would work to the detriment of Mr. Baker. And I think going with this route that all the parties agreed to, it was just at the last minute that Mr. Baker is throwing in these documents. And I think the court needs to understand the historical perspective. From the beginning of this case, Mr. Baker was served with a subpoena for the custodian of records of discovery construction, was served with a subpoena for all the financial records. When the FBI and the IRS went and looked at the conics of boxes and they found all of the Bryn Mawr projects were empty, they went back and discussed that with Mr. Baker and Mr. Fitzgerald. And they claimed that the credit union had all of the documents. The credit union, as Ms. Lee testified, had the same problems with getting verifiable records from Mr. Baker. He just didn't have them. And so, and you know, I think you can presume that the credit union would have given us whatever they had if they had it. The records just did not exist. What existed were screenshots. The bank accounts. I'm sorry, forgive me, screenshots from the discovery. The L1s, the L2s. We either get a listing or we get screenshots. But we get no actual proof of payment. And so the dilemma the government was in is giving him as much as is credible, but also challenging and not allowing erroneous numbers to just be thrown at the court with no substance. And so it was a balancing act that was very difficult. And it was very difficult for the judge. And the judge bent over backwards. Yeah, he decided to leave it up to us. It was too difficult for him. Yeah, us, the collective us. That's correct. And so, yes, you could remand it, and we could give the additional amounts that are due in owing. We could remand it, and you could order them, you know, a more clear indexing of the payables. However, no one's discussed the insurance issue, and that will come up. So I would ask that you consider that. Is there a discrepancy in the amount of money that was owed to the insurance company? Yes and no. The problem was we were both correct in our amounts. The lesser amount, the $2.3 million, the credit union had to pay a contingency fee and some other costs. And so they actually, as the insurance payment, just got the $2.3. In the record, do we have anything that clears up? You know, in the record we have these two indications. You're both making representations to the district court about what Gary Sleeper said, and they're different numbers. They are different numbers. And, no, that is another thing that could be cleared up. And just in all honesty, the insurance issue was brought to the court's attention at the end of the sentencing by the probation officer. I never have victims who are insured. I never looked at that part of the statute clearly. And until that became an issue, I'm like, oh, yeah, he doesn't, the credit union doesn't deserve a windfall. So as long as it's clear to the court that whatever is paid by insurance is to be not credited to the defendant but to be first paid in restitution with the remainder going to the credit union, I think that would be fine. It's just that Judge Beisheim, I think that's an issue that needs to be clarified for the court also. But under rovers. You know, I feel like I'm in a construction case with how many nails per foot went in. And it strikes me that this is not a very strong place for appellate judges to be. We all know there are a few problems that have come up. And it strikes me that there's a better way of handling this because both sides know what the problems are. Has there been any effort between the government and the defendant to try and work this thing out in a reasonable way to present it to the court as an ultimate result? No, Judge, there has not. But if it were sent back, I'm sure we would try to come up with something a little bit more formal. But all of this was, all of the numbers came into the court very last minute. The L1 and everything else came in very last minute. Yeah. I just hesitate to send it back to a busy district judge just giving them a pile of stuff and saying, we don't quite understand this. But the two people that know most about it are in a position perhaps to help, although we don't push mediation in criminal cases. But this is, I've tried to go through this entire thing, as my colleagues have. And I'm not sure we're in the best position to say what the dollars are or where they are. If there's a way of developing an answer to this question without sending it back to a district judge to sort through once more this pile of papers, creative counsel may come up with it. That's correct, Judge. I think that things could be cleaned up immensely in terms of what the actual costs are that should be given to Mr. Baker. I think the other concern that Judge Beisline may have, though, is the Supreme Court case that came out in terms of United States v. Rovers that came out in 2014. And in that, it would just be the amount of the theft minus what the property sold for. That is cleaner, and that's more straightforward, and that's really the current law, which brought into question some of the Ninth Circuit issues on this case. But it would be a much smaller credit, right? It would work to the favor of the credit union, that's correct. So I think ultimately Judge Beisline was asking for some guidance, and if we clean up the restitution issue, I think he's going to want to understand how to handle the insurance issue. So what Judge Wallace is asking is perhaps you would be willing to go to Ninth Circuit mediation and attempt to work out the numbers with the help of a mediator, and then make an agreement and then present that to us, as this is the number we agree on. I've never been exposed to that procedure, but I don't know that. They make house calls. In our district? Yes. In our closest chambers?  I'm not familiar with the procedure. I don't think we would, you know, not be amenable to anything that would work this out with the most efficient use of resources. All right. Thank you, counsel. I guess we should just ask you, Mr. Fitzgerald, whether your client would be amenable to Ninth Circuit mediation. I have a consultant with him about that, but I can tell that from my own perspective, I would not be opposed to that. Okay. Thank you, counsel. The United States v. Baker will be submitted.
judges: WALLACE, WARDLAW, CHRISTEN